IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


BILLY JOE WOLFE, JR.                                                              PLAINTIFF

            v.                              Civil No. 04-5177

SHERIFF KEITH FERGUSON;
MAJOR GENE DRAKE;
CAPTAIN HUNTER PETRAY; LT.
HENDRICKS; NURSE SUE
McDONALD; DR. NEIL MULLINS;
JOHN DOE MEMBERS OF THE S.W.A.T.
TEAM; AND JOHN DOE MEMBERS
OF THE S.E.R.T. TEAM                                                          DEFENDANTS


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Before the undersigned for report and recommendation is the civil rights complaint filed

by Billy Joe Wolfe, currently an inmate Arkansas Department of Correction, Cummins Unit.

Wolfe proceeds pro se and *in forma pauperis*.

While detained at the Benton County Detention Center, Wolfe contends his constitutional

rights were violated in the following ways: (1) excessive force was used against him during a

"riot" on June 2, 2004; (2) he was denied adequate medical care for injuries he sustained as a

result of the use of force; and (3) his First Amendment free exercise of religion rights were

violated when he was denied the right to have a prayer feather.

Wolfe was unable to identify the individuals who he alleges used excessive force against

him on June 2, 2004. In an effort to assist him in identifying the individuals involved in using

physical force against him, the court on December 8, 2004 (Doc. 20) directed a questionnaire to

-1-

SERT (Specialized Emergency Response Team) and SWAT (Special Weapons and Tactics) team members who were present on June 2, 2004. Wolfe was still unable to identify the individuals involved.

An evidentiary hearing was conducted on August 9, 2005. At the conclusion of the hearing, the court indicated it would issue a subpoena duces tecum for: (1) the medical records of William Bennett from the Diagnostic Unit of the Arkansas Department of Correction; and (2) photographs taken of William Bennett when he was transferred from the Benton County Detention Center to the Arkansas Department of Correction, Diagnostic Unit.

## I. BACKGROUND and EVIDENCE PRESENTED

At the evidentiary hearing, the court heard the testimony of a number of witnesses. For purposes of discussion, the court will summarize the testimony given.

### Testimony of Billy Joe Wolfe, Jr.

I was booked into the Benton County Detention Center (BCDC) on January 8, 2004. *See Defendants' Exhibit* 11. The riot occurred on June 2, 2004. I was in pretrial status at this time.

I was in E-102 in lock-down. I was assigned to cell 219.

The jailers called for outside recreation. We were outside for an hour. I was called back in to eat lunch. It was 10:00 or 10:30 a.m.

I went upstairs to my cell to lock-down. Five or six black guys and one white guy refused to lock-down. They wanted to talk to the sergeant about the bean hole. You get fed through the bean hole in the cell door and it is not cleaned.

At that time, to talk to a sergeant you had to be put on a list. The sergeant would come down when he had time.

Chris Jackson and I went upstairs. Jackson went back down. I went in my cell and shut my door. I didn't have a roommate. Deputy Flowers opened the pod door and told them to go to their cells and lock down. The inmates refused. They put water and shampoo on the floor.

Some inmates asked me to push my button and ask for their cell doors to be opened. Deputy Hall came over and opened Chris Jackson's door. I called for several inmates but Hall said they had their chance. No more cell doors would be opened.

There were thirty-two people on the block. Some inmates were in their cells. About fifteen inmates were not allowed to go into their cells. Plus there were the six that started causing the problems in the beginning.

The inmates who were refusing to lock-down were in the day-room. Some had t-shirts or towels tied around their heads. The pod door opened and a flash bang grenade was thrown in. SWAT and the SERT then came in.

I went and laid down on the floor. I put my hands above me. I could hear people being hurt and beat. I laid down on purpose. This had occurred before in a different pod.

My cell door was opened. I think Todd Johnson and Paul Clifford came in. I was laying on the concrete floor when they came in. They handcuffed me behind my back. Johnson said something like: "Stay on the floor." When they left my cell, they shut the door.

A short time later, maybe a couple of minutes, at least two or three SWAT or SERT members came in. They entered the cell telling me to turn my f------ head. They were hitting and kicking me in the ribs and legs. They hit me ten to fifteen times and kicked me ten to fifteen times. It was probably fifteen blows all together. They were hitting and kicking me hard. On a scale of one to ten, my pain was at a ten. I told them I was not involved in the riot.

-3-

I couldn't recognize them. They had their faces covered with black cloth.

Clifford came back and said: "No one in red and white clothes was involved. Leave him alone." I was the only inmate in pod E-102 in red and white clothes.

After Clifford told them this, they left. I don't think they shut the door. A couple of more officers then came in cussing, screaming, and hollering. They told me to turn my head. They roughed me up. They were not actually hitting or kicking. One put his knee in my back. They were SWAT or SERT members. Every inmate there was getting beat up.

I was laying on the floor. There could have been more officers who came into my cell. I want to say there was a third group that came in.

I could still hear people being physically abused. I heard screaming and hollering. I turned and looked every time I heard boots.

I saw Captain Petray walk by my cell door. He came into my cell. He told me to turn my f------ head or he would break my head. He kicked me twice. He stomped me on the back of my head. He told me he would break my f------ neck. He told me twice he would break my f------ head if I didn't turn and face the wall. He told me I had a whole lot more to worry about.

I had no blood from my head. Nothing was broken in my head. I'm sure there were bruises on the back of my neck. There were no bruises on my face. My head was laying on the concrete. My pain was at a ten.

My whole body was hurting. At this point, I think my shoulder was okay. I can't say for sure.

AO72A
(Rev. 8/82)

I heard them say: "Where is Wolfe.?" Deputies Rahn and Donahoe came into my cell to escort me out. They picked me up. I was laying stomach down on the floor. I'm sure they didn't mean to hurt me. They didn't hit or kick me or physically abuse me.

They took me downstairs. They took me outside to the recreation yard with everyone else. I was put face down on the concrete. Deputies were still beating people up.

Deputy Davis and maybe Deputy Rahn were checking handcuffs and if they were too tight they were loosening them. They asked if anyone needed medical attention and I said yes. I think it was Davis that I told there was something wrong with my shoulder. I was not bleeding but I was hurt. I don't know for sure when my shoulder got hurt.

Davis went and asked someone. Davis came back and got me up.[1] I was taken to the nurse's station. The doctor was on vacation.

She looked at my shoulder. She said it was abnormally out of place. She sent me to the hospital for x-rays. After the x-rays were taken, I was returned to the BCDC and that was it.

My lawyer happened to be there. She told me to write everything down.

I was put back into my cell. I asked Sgt. Clifford if I could get something for the pain. She called the nurse. The nurse let her give me three Ibuprofen.

I had bruises but no cuts. My whole body was sore but my shoulder was hurting the worse. On a pain scale from one to ten my pain was at a ten for a couple of weeks. My shoulder bone hurt. It sticks up. No one said what the problem is with my shoulder. My left shoulder was injured when they lifted me up off of the floor in my cell by my arms.

---

[1] Although Wolfe initially testified that Davis took him to the laundry room to get a shirt before taking him to the nurse's station, Wolfe later testified this was incorrect. He stated Davis took him directly from the recreation yard to the nurse's station.

AO72A
(Rev. 8/82)

The next day I filled out a grievance. *Defts' Ex.* 11 ("I am in pain a great deal of pain. I need to see a doctor about the x rays."). I saw the nurse in pod control the following day. She said the doctor would be there on Thursday. She said he came once a week. I never saw him that week. The nurse gave me Ibuprofen.

I put in a medical request on June 6th. *Defts' Ex.* 14. I finally saw Dr. Mullins on the 9th or the 10th. He asked what the problem was. I told him my shoulder. He asked if I could raise my arm. I raised it. He said it looked like an old injury he gave me a shot of steroids and Ibuprofen. The steroids made by eyes blurry and gave me a headache. I didn't want anymore of the steroids.

I put in my next medical request on June 17th. *Defts' Ex.* 15. Ibuprofen is about the extent of the treatment you get at the BCDC. I might have told the doctor I didn't want the steroids anymore. At some point, the nurse said they were not going to give me Ibuprofen anymore.

On June 23rd, I submitted a grievance. *Defts' Ex.* 16. I said when I was handcuffed my shoulder was hurt again. I said I needed to see the doctor and something needed to be done about my shoulder. I said Ibuprofen was not a cure.

On June 24th, I asked for a second opinion. *Defts' Ex.* 18. I stated Dr. Mullins had done nothing to help me.

On June 25th, I submitted a grievance about conditions at the BCDC including my being denied medical attention. *Defts' Ex.* 19. On June 28th, I submitted a medical request because my shoulder was hurting and I could not sleep.

-6-

I saw Dr. Mullins a couple of times. He said it was an old injury. I saw him on June 30th. I mentioned the x-rays. He said: "What x-rays?" The nurse said the x-rays were negative and gave him a copy of the record. He said the x-rays had been read by a radiologist. Dr. Mullins said the radiologist was a doctor and was not wrong.

He said it was an old injury. He gave me Ibuprofen. He said don't come again.

I submitted a grievance asking for the name of the radiologist. *Defts' Ex.* 23. On July 6th I submitted a grievance complaining that the medical staff was doing nothing about my shoulder injury. *Defts' Ex.* 24.

I saw Dr. Mullins a number of times. He evaluated my shoulder but I disagree with his evaluation. He did nothing other than give me Ibuprofen. I wanted a second opinion. I disagree completely with his evaluation.

I'm nine-sixteenths Cherokee Indian. *Plff's Ex.* 3 (United States Department of the Interior Bureau of Indian Affairs card showing Billy Joe Wolfe, Jr., is 9/16th degree Indian blood and a certified member of the Cherokee Nation). My ancestors came on the trail of tears. I pray to the Great Spirit. I use feathers to pray. I used a feather when I lived at home.

I'm thirty-five years old. Most of the time I've lived on an Indian Reservation. When I was in the Oklahoma Department of Correction I was allowed to have seven prayer feathers. I could use them when I went to the sweat lodge.

I worship alone with the feather. It is a personal ceremony. My whole family worships this way. In my belief it stands for the peace of mother nature.

When you take away the prayer feathers you take away what an Indian stands for. I believe it stops everything I believe in for when I return to earth. It puts a pause in my life. It

-7-

takes part of mother nature away. I can't pray to the Great Spirit without a prayer feather. When you are locked up, mother nature has been taken away.

I used prayer feathers everyday. It can be an eagle, owl, or hawk feather. Birds are spiritual. The eagle is the most powerful. I usually keep a feather close by me. I have one in my house. One hangs in my vehicle. If I'm outside, mother nature is all around me.

I have one hundred to one hundred and fifty feathers. Some of the feathers were on the trial of tears. I would have had an eagle feather brought to me at the jail. It would be a foot or one and a half feet long and black tipped.

I use the prayer feathers for spiritual belief. I would say you can't communicate with the Great Spirit without a prayer feather.

While at the BCDC, I couldn't pray. Everything I believe in as a Native American was taken away from me. The Arkansas Department of Correction is trying to get my prayer feathers. You can go through the Game and Fish Commission.

If I had been allowed to have a prayer feather, I would have had a family member, my sister, deliver it. I was housed alone at the BCDC. The quill of a feather cannot be sharpened. If you cut into the tubing of a feather it is hollow. It is not strong enough to be a weapon.

You are allowed to have golf pencils in your cell. You can also have paper, a Bible, whites, shampoo, a toothbrush, and toothpaste.

I filled out a request to the jail administrator asking for a prayer feather. I didn't get it back. I filled out a grievance. The grievance was answered by Nurse McDonald. *Plaintiff's Exhibit* 1. She said I would have to have my family do this.

-8-

The next day as I was being escorted back from court, I ran into Lt. Hendricks. I asked him about the prayer feather. He said he had gotten my request, took it to the major, and said they were going to send it to their lawyer. I told him about him about McDonald's response. He said: "What in the hell is she doing responding to grievances?"

A few days later, I got the request back. It said for safety and security of the facility, I was not going to be allowed to have a prayer feather. *Plff's Ex.* 2. I think I got it back on the 25th. It was signed by Petray.

When I was booked in, they asked me questions and then you sign indicating the information contained on the booking sheet is true and correct. *Defts' Ex.* 11. Under religion, it states: None. They were referring to Baptists, etc. I pray to the Great Spirit. It is a religious belief of Native Americans. I put Indian down on my wrist band at the BCDC.

I studied a Bible at the BCDC to get out of my cell. It was simply a way to get some time out of the cell.

### Testimony of Ian Shane Bruce

I'm currently an inmate in the Arkansas Department of Correction (ADC), Varner Unit. I was in the BCDC on June 2, 2004.

I was in the first cell on the bottom tier of E-102. *See Defts' Ex.* 1 at page 2 (location marked with an X). There were some Pulaski County guys who got shipped to the BCDC and the didn't like it. They wanted to go to prison. At the time, you couldn't get a grievance without seeing the sergeant and you had to get on the list to see the sergeant.

We were let out for recreation. When we came back in and it was time to eat, the Pulaski County guys wouldn't lock-down. They wanted to talk to the sergeant. The doors were open.

They went around shutting them. Mine was shut. They wouldn't let people get in their cells.

Chris Jackson got his cell opened. I was caught outside when SWAT showed up. The people on the bottom tier were acting up more. There were about six inmates on the top tier. They were just sitting. There were about six inmates on the bottom.

I went up to the top tier. I was close to Wolfe's cell. *See Defts' Ex.* 1 at page 1 (location of Wolfe's cell marked and Bruce's location marked with an X). We had been out a couple of hours.

I saw a guy praying. I started praying. I saw a flash grenade coming straight towards me and then it dropped. I was above it. I got up and saw all the SWAT and SERT members coming in. I saw a guy getting beaten up. He was sitting at the top of the stairs reading a book. Then he laid down.

I saw everyone going into one cell. It was an open cell on the top tier. I went in. They shut the door. There were about six inmates in the cell.

A SWAT team member pulled me out of the cell. I was taken outside the cell but left on the top tier until I was taken to the recreation area. SWAT team members told me to get down. I was laying on my stomach.

Two people pulled another guy out of the cell I had been in. There were three or four left in there. Team members went in there and started hitting them with a kind of baton. I could see they were beating up Jimmy Robb. All the people from Little Rock were getting beat up.

I could see Wolfe's cell. I saw Johnson come out and shut the door. I didn't see what happened between Johnson and Wolfe. I saw a couple more go in there a little later.

-10-

In Wolfe's cell. I could see they were on him. I saw one guy on his knees. I didn't see any hitting or kicking. Then another deputy came in and said there were no red and whites involved. They stopped and all left.

Captain Petray was down below. I heard Petray say: "Where's Wolfe?" Petray and three or four officers went in there. They told him to turn his head of they would break his f------ neck. They stomped him. I could see feet moving. I could see the bottom half of Wolfe's body–from the belt down. I could see their legs moving towards him and jumping and Wolfe's body jumping. I never saw a foot make contact with Wolfe.

At the time Wolfe weighed three hundred and twenty pounds. He was the only guy in red and white. It seemed like they hit and kicked him a lot.

I was in the BCDC for about twelve months before the June 2nd incident. I got in trouble there sometimes. On May 22nd, I went to the hole because I got in a fight with Richard King.

I didn't suffer any injuries. I was stepped on. I prayed.

I saw Wolfe on the other side of the recreation yard. He went to the hospital about his shoulder.

Wolfe's shoulder stuck out on one side. It wasn't like that before. We worked out together before the riot. I saw he had a couple of bruises when he showed me his shoulder.

Wolfe is Indian. My Dad talked about that and I'm good at history.

Christians consider the Indians to be pagans. He mentioned that the feather was part of his beliefs. He told me that in November or December.

One of the rules at the BCDC was that you had to be fully clothed. If you weren't, you got locked down.

-11-

*Testimony of William Bennett*

I'm currently an ADC inmate at the Cummins Unit. I was in the BCDC on June 2, 2004. I had been booked in on May 27, 2004. I was put on lock-down on May 28th. I was in convicted status.

I was housed in the lower level mid-way down the left hand side. I stayed in my cell when the others went on recreation call. A cellmate and I slept in.

When the inmates were coming back in most of the guys went into their cells. Six inmates from Pulaski County refused to lock-down. They were upset because they had been sent to the BCDC rather than to the Diagnostic Unit.

One of the guards opened the pod door and said go lock-down. The Pulaski County inmates got shampoo and stuff and started to put it out on the floor. I was standing at the cell door window watching.

The guards opened the pod door. They threw in a flash grenade. SWAT and SERT came in. All doors in the cell block were popped open. My cellmate and I got down on the floor.

We were handcuffed. Four team members came in our cell. They pulled their batons out and repeatedly hit and kicked us. They were screaming: "Who's jail is this anyway? Turn your head towards the wall." They were cursing.

I was hit or kicked at least fifteen times. They were hitting and kicking hard. I was hit on the hands and leg. I was black and blue from head to toe.

My shoulder got hurt when I was snatched off the floor to be taken to the recreation area. They picked me straight up off the floor by the cuffs. They were lifting up on the handcuffs and

AO72A
(Rev. 8/82)

being rough. They were not being careful. It didn't feel like they were intentionally trying to hurt my shoulder.

The same thing happened to my roommate. I could hear team members screaming, batons being used, it went on for about five minutes. They all had their faces covered.

After I was taken to the recreation area, I said I was injured. I was taken to the emergency room and x-rays were taken. I was sent back. They didn't let us know what the x-rays showed. I didn't receive any Ibuprofen or anything.

I had no contact with Wolfe during the riot. The first contact I had with him was when we went to the emergency room together. He was having problems with his left shoulder. Wolfe and I were the only ones who said we were hurt. When we got back to the BCDC, we were placed back in our cells.

I was shipped to the Diagnostic Unit of the ADC on June 4, 2004. Four or five days later, the warden came and took pictures of my injuries. I was black and blue everywhere. This was about ten days after the incident at the BCDC. When I got to the Diagnostic Unit, they said my shoulder was completely separated.

Another inmate, Allan Matlock, was shipped to the Diagnostic Unit with me. He needed stitches. The warden took pictures of both of us.

**William Bennett's Records produced from the ADC pursuant to Subpoena duces Tecum**

As noted above, at the conclusion of the evidentiary hearing, the court issued a subpoena for (1) the medical records of William Bennett from the Diagnostic Unit of the ADC; and (2) photographs taken of William Bennett when he was transferred from the BCDC to the ADC,

AO72A
(Rev. 8/82)

Diagnostic Unit. The records were received on August 31, 2005, and marked as court's exhibit 1. Copies of the records were provided to plaintiff and defendants' counsel.

According to the records, Bennett came into the Diagnostic Unit as a new commitment on June 4, 2004. *Court's Exhibit* 1 at page 6. His intake photograph shows no visible wounds or bruising. According to the records sent, "no photographs [were] found of inmate William Bennett ADC # 130727 during the intake process concerning injuries of any kind." *Id.* at page 1.

His intake physical in the medical history notes contains the following comments:

> states he was involved in an altercation with the Benton Co. Sheriff's Dept. 2 weeks ago which caused him to receive a separated left shoulder. "They didn't given me medical treatment, they sent me to their doctor because they thought I was going to sue them. I've played football and baseball a lot, and I know what x-rays look like with this problem, and I know how it feels when this happens. The doctor they sent me to said nothing was wrong."

*Court's Ex.* 1 at p. 11.

Upon physical examination, it was noted Bennett had some "[t]enderness to left a/c joint, no muscle wasting, excellent hand grips bilaterally." *Id.* at p. 11. It was also noted he had nearly complete range of motion to the left shoulder with the "possible exception to overhead straight extension." *Id.* Under behavioral assessment, the following comment is written: "The degree of patient's physical complaints regarding left shoulder did not correlate with the objective findings." *Id.* He was diagnosed as having "left shoulder pain" and prescribed Motrin. *Id.* Under restrictions and limitations, the following is written: "4. Restrict assignment requiring handling, lifting o[f] heavy materials in excess of 20 pounds or requiring overhead work for a period in excess of 6 Hours." *Id.* at p. 12.

-14-

His physical examination on December 15, 2004, revealed an "old [fracture] hand, & separation shoulder [left](completely healed–no problem." *Court's Ex.* 1 at p. 8. In the physical assessment comments section of the report of physical examination form, the following is written: "old injuries completely healed–no restrictions." *Id.* at p. 9. On another page it states: "old [fracture] hand [left]–healed-no loss of [range of motion] or strength. Old shoulder injury–completely healed–no problem." *Id.* at p. 10.

### *Testimony of Nicholas Donahoe*

I do detail work now but I was a jail deputy for about two years. I responded to the riot on June 2, 2004. I was member of SERT.

I received a page. I dressed out in my black uniform, body armor, and protective gear. The uniform consists of black boots, black pants, a black shirt, and body armor. We don't wear masks.

We were briefed by Drake. Drake said the inmates were not wanting to lock-down. I was told the inmates were refusing to go back into their cells. They were pouring shampoo and water on the floor. One inmate had a broomstick. They put the shampoo and water on the floor to make the officers fall when they came rushing in. Some of the inmates had towels and shirts over their faces.

SWAT entered first. There were about six SWAT team members. SERT entered second. There were about ten SERT members.

A flash grenade was thrown. SWAT went to the bottom right. We went up the stairs right away. It was Davis, myself, and Rahn. The idea was to take control. We were to handcuff the inmates and then take them to the recreation yard  Once there, we asked if they needed

-15-

medical attention. The inmates could have gotten hurt from the soap and water on the floor. Injuries can also occur during a riot.

We rushed in and put handcuffs on the inmates as quickly as possible. We didn't say a thing. We determined who started the riot as we were taking them out.

I went into Wolfe's cell to escort him out. The procedure is to roll the inmate on his side, bring his knees to the side, help him to balance so he can stand, and then take him out. Wolfe made no complaints. He didn't resist us. He didn't say anything to us from his cell to the recreation yard.

The inmates I had contact with did not put up any resistance. I didn't hear any inmates yelling in pain. They were yelling because of the rioting. There was yelling, cursing, and discontent within the pod.

I didn't see or hear anything suggesting officers hit or struck any inmates. I could not see what was happening on the first floor. I went upstairs with Deputy Davis and Deputy Rahn. I did not go into Wolfe's cell and cuff him.

I have helped contain two riots. I have received jail standards and SERT training on handcuff techniques, self-defense, etc. According to policy, the inmates not wanting to participate in the riot should have been given an opportunity to withdraw. Everyone in the pod had an opportunity to go in their cells and shut their doors.

I wrote a report following the incident. *Defts' Ex.* 2.

### Testimony of Matthew S. Rahn

I am a deputy first class. At the time of the riot, I was a regular deputy and a SERT member.

I was off duty when the riot started. My pager went off. All SERT and SWAT team members were to respond. I responded and started getting into my SERT uniform. It is all black gear.

Drake said E-102 was not wanting to lock-down. He said the inmates were putting soap, water, and shampoo in front of the pod door. One inmate had a broomstick. Some inmates were praying. Some inmates looked like they were practicing marshal arts.

I was following Sergeant Ponge. I was a newer member. We approached an inmate. I put his legs in a leg lock. We handcuffed him. I then rushed upstairs. Someone said they needed handcuffs. Both inmates were in prone positions. SWAT team members were up there.

Someone said get Wolfe to the recreation yard. I went with Donahoe. We rolled Wolfe to the side, lifted his knees to his chest, had him get to his knees, and then helped him stand up. I don't believe Wolfe yelled out in pain.

We took Wolfe to the recreation yard. I loosened his cuffs. I made sure they were double locked. I took one of the Pulaski County inmates to the nurse's station. I took him back to the recreation yard.

I was watching. I didn't see anyone take a free hit or kick to a handcuffed inmate. All inmates were under control by the SWAT team members.

This was the only riot I have been involved in. Afterwards, I wrote an incident report. *Defts' Ex.* 3.

Every now and then we go over the policy and procedures regarding riot control. I've gone over it quite a few times.

Before we entered the pod the inmates were given a last chance to lock-down. We should have opened the cell doors for them.

Major Drake did the briefing. When we got to E-pod, the captain, the sheriff, and the lieutenant, were there. Drake said we should get the inmates under control, handcuff them, figure out who was rioting, take the inmates to the recreation yard, and get the pod cleaned up. Our goal is to regain control of the pod or cell block. All inmates are taken out of the pod whether they were involved in the riot or not.

A riot is when the inmates are acting in an aggressive manner. In this case, they were attempting to sabotage our entry and were doing marshal arts. I restrained one inmate's legs and handcuffed two who were already restrained. I was really just focusing on what Ponge was doing.

Inmates wear red and white stripes when they are at the BCDC on murder charges or on charges of a serious nature.

### Testimony of Terry Davis

I was a detention deputy at the BCDC in June of 2004. Now I'm with the Fayetteville Police Department.

I was a SERT member. After I entered the pod, I used a common peroneal strike to one inmate, Perez-Badillo. *See Defts' Ex.* 4. I was assisting Becker. The inmate was refusing to be handcuffed.

I didn't see another team member hit or kick an inmate.

-18-

After Wolfe was placed in the recreation yard, he told me he needed medical attention. Wolfe said his left shoulder was hurting. I left the yard and told Petray and Hendricks. They told me to take him to the nurse.

I rolled Wolfe to his side, helped him balance while he got on his knees, and then helped him up. We didn't go the laundry room. He had his clothes on. We went directly to the nurse's station.

I couldn't see any visible injury to Wolfe. He had no bruising or cuts. I took Wolfe to be evaluated by the nurse. He told her that he was having left shoulder pain. He didn't mention anything else in my presence.

This was the first riot I was involved in. Our orders were to take control of the pod and all inmates in the pod. We don't go one on one with an inmate. Not all jail staff is certified to carry a baton. You use whatever force is necessary to contain the situation.

It is possible Perez didn't understand our orders. However, we have given him other orders in English that he has understood.

Red and white clothing is used for inmates who are being held on violent offenses or who have fleeing charges. When we entered the pod, we threw blankets down on the floor for traction. Just being restrained can cause injuries.

### Testimony of Brett Becker

I was a SERT member on June 2, 2004. I had no dealings with Wolfe that day.

Defendants' exhibit 5 is my report. I saw officers use force that day. Force was used on inmate Perez-Badillo to place him on the floor. A strike to the common peroneal. I saw no other uses of force.

-19-

This was the first riot I was involved in.  Our orders were to restrain all detainees in the pod.  At the time we entered the pod, we didn't know who the suspects were.  Anyone could return to their cells and shut their cell doors.  When we entered  we entered the pod, the cell doors were open.  During the briefing, we were also told that all detainees had been given an opportunity to go into their cells.

### Testimony of Randy Bryson (formerly Randy McPherson)

I was a SERT member.  I saw no one hit or kick an inmate who was handcuffed.  I had nothing to do with the plaintiff.

This was the first riot I had been involved in.  As far as I know, all inmates were given an opportunity to go back to their cells.  We handcuffed the inmates and took them out to the recreation yard.  I wrote an incident report.  *Defts' Ex.* 6.

### Testimony of Mark Unidiano

I'm a patrol lieutenant.  On June 2, 2004, I was called in as a SWAT team member.

The SWAT and SERT members lined up in two columns.  A flash bang grenade was deployed.  There was a lot of smoke.  The SWAT team entered.  Then SERT entered.  The inmates scattered.  We were trying not to fall.

The only use of force I saw that day was inmates being taken to the ground.  I didn't see any inmates being hit or kicked.

I had nothing to do with Wolfe.  I didn't see anyone in red and white clothes that day.  There was a lot of confusion or commotion.  I didn't write a report.

I've been involved in three riots.  I'm no longer a SWAT team member.  I don't work at the jail so I am not familiar with jail policies.

-20-

### Testimony of Steve Bell

I'm a field patrol officer. I was a SWAT team member on June 2, 2004.

I didn't write an incident report. I observed force being used. I used force on an inmate who was sitting on the stairwell. He was taken to the floor using an arm bar. He failed to get to the floor when ordered to do so.

I did not see anyone hit or kick an inmate while handcuffed. I never saw Wolfe that day. I don't recall seeing anyone in red and white clothes.

I've worked in Benton County for almost five years. I was involved in two riots. I had SWAT training. I haven't had any specific riot training but I was trained in the use of distraction devices to gain entry, handcuffing techniques, etc.

I don't work in the jail. I'm not familiar with jail policy.

### Testimony of Robert Holly

I am a field deputy. On June 2, 2004, I was a SWAT team member. I've had SWAT training.

I used force against a black male. He had been seen with a weapon earlier. I forcibly put him on the ground. I used baton strikes to the common peroneal area. He had his harms under him.

I saw a few inmates being put on the ground. I did not see anyone being hit or kicked after they were handcuffed.

I've never seen Wolfe until today. I didn't write an incident report. I'm not part of jail staff.

### Testimony of Richard Wells

I'm a criminal investigator. I was a SWAT team member. On June 2, 2004, I participated in the riot control.

I deployed the flash bomb. I used no other force. I went upstairs on the left side. I observed no other use of force.

I had no contact with Wolfe. I do know him. I did not write a report following the incident.

### Testimony of Jason Hahn

I'm a field deputy. I've been a deputy for four years.

I'm a member of SWAT. I participated in the June 2, 2004, incident. I've had SWAT training.

I observed the use of force by some officers. Some detainees were resisting. I observed officers taking them down.

I went upstairs with Atchison. We went into a cell. The inmates would not give up their arms to be handcuffed. Atchison used a common peroneal strike.

I had no contact with Wolfe. I saw no force being used against inmates who were already handcuffed.

The cell doors were open when we went in. I didn't use any physical force. I don't work in the jail. I'm not familiar with their policies.

SWAT is used on high risk situations in the jail. SWAT is used to make the jail secure.

When we entered the pod, there were numerous individuals outside their cells. There were maybe ten inmates outside their cells on the lower tier. They were making gestures, etc.

AO72A
(Rev. 8/82)

I was not aware of anyone in red and white clothing. I went up the stairwell to the left.

### Testimony of Nathan Atchison

I'm a sergeant in the patrol division. I've worked for the sheriff's office for eight years.

I saw force being used. Hahn said he would be with me to assist with the handcuffing. Once the flash bang grenade was displayed they ran. The first cell we entered the inmate had his arms underneath him. He would not allow us to handcuff him. I had to strike him several times in the common peroneal.

There were still inmates out on the top tier. More common peroneal strikes were used. The inmates were cuffed. I don't recognize Wolfe. I didn't file a report.

One inmate had a broomstick. The inmates were making loud off color remarks and gestures towards the deputies. All inmates were handcuffed.

When I first went in I fell. Then I slide to the staircase and went up the left hand staircase.

I entered the first cell and then just continued going down the cells until all were done. I struck the inmate no less than twice–no more than four times. I struck him until he complied and then I stopped.

Once the flash bang went off everyone ran for the cells. The inmate was keeping his hands underneath him. He could have easily been the one with the broomstick. I saw some inmates run upstairs. I would say there were ten to twelve inmates downstairs.

I used my baton on two people. I didn't mention hitting the second inmate when I responded to the court's questionnaire. When I got to the cells, they were unlocked.

AO72A
(Rev. 8/82)

### Testimony of Paul Clifford

I'm a patrol sergeant. I'm a member of SWAT. I've been with the sheriff's office eight years.

My involvement on June 2, 2004, was very limited. I arrived late. By the time I got there, all inmates had been secured. The inmates were being moved to the recreation area. I escorted one inmate out. I had nothing to do with Wolfe.

### Testimony of Denny Birdsong

I'm an ex-jail sergeant. I was a jailer on June 2, 2004.

I arrived late. It was over. I video-taped the damage to the jail.

I worked there for about two and one half years. I was a sergeant about a year. I'm familiar with the policies and procedures of the jail. From what I heard, inmates were given an opportunity to go to their cells before the teams entered the pod.

All inmates were out of the pod when I video-taped. I video-taped for ten to fifteen minutes. I did the whole pod. I taped the stuff put on the floors. The water damage. The doors that had been kicked. A sprinkler head that looked damaged. I just video-taped everything that looked bad. There was a lot of trash. There was a mop handle.

### Testimony of Michael Ponge

I was a detention sergeant. I left there about one and one-half months ago.

On June 2, 2004, I was a SERT leader. I got a page and responded. Drake told us the inmates had refused to go to their cells. He said they had put water in front of the pod door.

I used force on an inmate, Jacob Penn, I put him to the ground. He didn't want to go. I used strikes to the common peroneal.

I didn't see any hitting or kicking of inmates after the inmates were handcuffed. I used necessary force to control the situation.

I had no dealings with Wolfe. I don't know who went up there. It could have been a SWAT team member.

I wrote a report. *Defts' Ex.* 7. The objective was to get everyone secured regardless of whether they were involved in the riot. The policy provides that everyone should have an opportunity to go back to their cell. If the cell doors are shut, you can't get in.

I worked there almost three years. I had training in defense tactics, handcuff techniques, and cell extractions. It is a riot whether three inmates are involved or three hundred. There were ten or twelve inmates involved.

### Testimony of Michael Hook

I'm a jailer. I didn't participate in the incident on June 2, 2004. I was not employed at the sheriff's office at the time.

The only connection I have with this case is that Petray told me Wolfe was going to be allowed to see the video-tape from that day. I stood in there while Wolfe watched it and then I escorted him back.

### Testimony of Keisha Clifford

I'm currently the training coordinator. I was the shift sergeant on duty on June 2, 2004. I was contacted by the deputy and told the situation. I went to E-pod. I observed the inmates in the day-room area. I got on the intercom and told them to go to their cells for lock-down. They refused. I called Captain Petray.

AO72A
(Rev. 8/82)

I decided to video-tape it when the inmates started getting out shampoo etc. I video-taped for about ten minutes. I then turned it over to Deputy Serano.

Wolfe was in a cell. I don't know if it was locked. I was not in pod control.

When we gave the inmates an opportunity to go back to their cells, we opened and then closed the cell doors. The inmates in the day area were given an opportunity to go to their cells several times. I didn't observe any use of excessive force.

After the inmates were in the recreation yard, I went out and asked who was having medical problems. Wolfe said he needed medical attention. He was having a problem with his shoulder. He didn't have any marks on his face.

I told him to hang on tight until all inmates were secured. After that, someone brought him out of the yard. I saw Wolfe pull his shirt out. I don't recall exactly what I saw but I recall thinking that looks a little odd.

### Testimony of Deputy A. Flowers

I'm a corporal now. I supervise other deputies.

On June 2, 2004, I worked pod control. I called Sgt. Clifford and told her the inmates were not locking down. She came to the pod and gave them an order to lock-down. They refused. She contacted the correct people. I wrote a report about the incident. *Defts' Ex.* 8.

There was a problem when the Pulaski County inmates first came in. They didn't like it in Benton County. They didn't want to be there. Most of the inmates in the pod were from Pulaski County.

-26-

That day, they were taking mop buckets of water and dumping them by the main door and emergency exits. There had been a riot a few months before. I know the doors were opened several times that day to allow the inmates to return to their cells.

### Testimony of Captain Hunter Petray

I'm the jail administrator. I have been for three years. I oversee jail operations.

On June 2, 2004, I recall being contacted by Deputy Flowers. She informed me the inmates were refusing to lock-down. I had SWAT and SERT paged and advised Drake of the situation.

I believe it was my decision to have the incident taped that day. The tape submitted to the court as *defendants' exhibit* 9 is what was taped that day.

Members of the SERT and SWAT teams suited up, were briefed, and went to the area and lined up. The inmates were doing various things: one guy was doing marshal arts moves; one was facing the wall masturbating; and one guy was on the table praying. Drake made the decision to enter.

When the pod was entered the inmates on the bottom tier scattered. Force was used. I saw inmates being taken down. I saw no use of excessive force. The whole incident lasted maybe twenty to twenty-five minutes.

Once the pod was entered, all inmates were handcuffed. I stood outside in the pod control area. I later followed the officers in and went to all cells to check on the inmates.

At the time there were maybe ten inmates still in their cells. I made sure there was nothing out of the ordinary. There was a lot of water and paperwork on the floor. In one cell a sprinkler head had been broken off. I had no physical contact with the inmates.

-27-

Just because an inmate might have been in his cell doesn't mean he wasn't involved in the incident. The inmate could have been egging on the other inmates.

I don't remember particularly walking into Wolfe's cell. I don't have a specific recollection of seeing him in his cell.

I did not hit, kick, or stomp him. I've never made the comment: "Whatever we do to the inmates we can justify."

I recall Davis saying Wolfe wanted medical attention. He was complaining about his shoulder. The jail has a policy regarding the provision of medical care to inmates. *Defts' Ex.* 27.

The jail also has a policy regarding inmates' practice of religion. The policy is that inmates have the right to the practice of religion. *Defts' Ex.* 28. One religion is not held higher than another. We have Bibles.

We don't provide religious items. Inmates can have religious items brought up to the jail for them but we don't generally accept property into the jail.

Wolfe filled out a request asking for a prayer feather on June 10. *Plff's Ex.* 2. I answered it on June 21st. *Id.* I had to do some checking. I wanted to make the right decision.

The decision was not to allow it. I had concerns about the quill being used as a weapon–to possibly stab someone. I have seen some feathers with strong quills. I talked to administration and sought a legal opinion as well.

Inmates have to have pencils to write correspondence. They have to have oral hygiene. They don't have to have feathers. Additionally, I was concerned that if Wolfe was allowed to have a personal item in his cell it might cause discontent among the other inmates.

-28-

Wolfe was housed alone. He spent twenty-three hours a day in his cell. In his hour out, he was not around other inmates. However, deputies had to interact with Wolfe and could be harmed by him.

### Testimony of Lt. Gene Hendricks

I'm a former BCDC employee. I left on January 1, 2005.

I was there on June 2, 2004. I was called at home by Petray at about 11:30. I went to the BCDC and to E-pod. When I got there, I saw several inmates between the stairwells in the cell block doing Kung Fu and swinging a broom handle. One inmate was sitting on a table. Several inmates were out of their cells on the top tier.

There were inmates out of their cells on both the bottom and the top tiers. Everyone was given an opportunity to go to their cells. There were roughly thirty-two people in the pod. The teams were called in to take control of the whole pod.

SWAT and SERT were there. I watched them enter and take control.

A couple of inmates had to be taken to the floor. I couldn't see into the cells where the inmates were handcuffed on the floor.

The inmates were taken out into the recreation area. I was in the recreation area. I moved inmates against the wall because of the heat.

### Testimony of Major Gene Drake

I'm operations commander. I've been in this position for the last two years.

On June 2, 2004, I was notified by Petray of the incident in the jail. The inmates in E-pod were refusing to lock-down. I okayed getting SWAT and SERT. I got reports from the pod area that shampoo and water were being spread on the floor.

-29-

I was there the entire time.  The inmates were given the opportunity to lock-down.  They refused.  When that happens, we are going to go in there and lock them down.  They were given several opportunities to lock-down.  Probably more than we should have.  Some inmates took us up on it.

We took control of the whole pod.  The inmates outside their cells were taken first.  Then the others.  All were taken out so we could survey the damage and then do a shakedown for weapons.

I saw force used on inmates refusing to go to the ground.  These inmates were forcefully taken to the ground.  No other force was used.  I saw no excessive force used.

I don't recall inmates asking for medical attention.  I'm not sure if the deputies were instructed to ask if any inmates needed medical attention.  If Wolfe was in his cell and it was locked, he was one of the last to be brought out of the cell block.

Benton County has a reputation for making inmates obey the rules.  The SWAT team members just didn't write reports.  They were there for a very short time.  The SERT members stayed and wrote reports.

### *Testimony of Sheriff Keith Ferguson*

I've been sheriff since January 1, 2003.  I'm the chief law enforcement officer of the county.  I'm responsible for the BCDC.

On June 2, 2004, I was not personally at the BCDC.  I was notified after the major had arrived.  I live about thirty-five miles from the jail.  By the time I got there, most of it was over.  The inside of the jail was a mess.  They had started getting the inmates out to get the pod cleaned up.

My employees have the authority that I give them to control things. We write reports about everything we do. This is especially true when it becomes physical. It isn't a written requirement that the SWAT team writes reports. Jailers wrote incident reports and got it pretty well covered. I watched the video-tape of the incident one time.

Benton County has a set of detainee rules. *Defts' Ex.* 29. These rules used to be based on the Ten Commandments. Under my authority, I can change the rules and get input from my staff. I changed the rules after I took office so they were no longer based on the Ten Commandments. There is also a set of inmate rights. *Defts' Ex.* 30.

I was involved in the decision on whether Wolfe should be allowed to have a feather. This is the first time this had come up.

There was a possibility he could use the feather to harm himself or others. The quill will pierce an eye. There is also the possibility he could use the feather for sexual gratification. The ultimate reason we denied his request was that the feather could be used as a weapon.

I knew Wolfe was in lock-down. He was housed alone and took recreation alone. The decision on the feather had nothing to do with him or his charges.

If we allowed Wolfe to have the feather, we would have to allow inmates to have rattle snakes, etc. We allow Bibles. While you could use a Bible to hit someone, you can use a quill to knock out on eye. We have inmates of one hundred different denominations and every nationality.

### Testimony of Nurse Sue McDonald

I'm the nurse at the BCDC. I was there on June 2, 2004.

I saw Wolfe regarding his shoulder. They brought him into the clinic. He talked about his shoulder being injured and hurting. I examined his shoulder and thought we should send him for x-rays. I believe I lifted his shirt to look at his shoulder.

My notes indicate the alignment of his shoulder was slightly abnormal. *Defts' Ex.* 25 at page 1. They also indicate he was given 600 mg. of Ibuprofen immediately. *Id.* He didn't have any contusions, cuts, or any blood on him or I would have written that down. I recall him saying he was in pain but I don't know how much.

I called the next day and the x-rays were negative. I gave him Ibuprofen for seven days because he was still complaining.

He was seen by Dr. Mullins on June 9th. *Defts' Ex.* 25 at p. 2. He gave Wolfe Prednisone, a great anti-inflammatory. *Id.* Dr. Mullins also gave Wolfe Ibuprofen. *Id.*

On June 10th, Wolfe refused the Prednisone. *Defts' Ex.* 25 at p. 2. He didn't say why he wanted it discontinued. I felt like Wolfe was getting a lot of attention for the shoulder ailment. If Wolfe had any other injuries, I would have put them down.

Wolf was under the jurisdiction of the jail. This means he was under that jail system and the jail doctor has jurisdiction to make decisions regarding his care. Wolfe had two opinions–one from the radiologist and one from Dr. Mullins.

The way it works is we don't get the x-rays. We get the x-ray report.

### *Testimony of Dr. Neil Mullins*

I have been employed at the BCDC for ten or twelve years. I visit the jail four times a week. If I'm on vacation, Dr. Howard normally comes once a week. If there is an emergency, the inmate is sent to the hospital.

My name was listed as the admitting doctor on the June 2, 2004, report. I wasn't there but this occurred because Wolfe was from the jail and the computer puts my name in as the doctor for jail inmates.

On March 24, 2004, I first had contact with Wolfe. *Defts' Ex.* 26 at p. 1. When I'm done seeing a patient, I dictate my notes immediately. In March he stated that he had been doing push-ups and someone had jumped on his back. *Id.* He had a contusion to his right rib. *Id.* I gave him Ibuprofen. *Id.*

On June 9th, I saw him because of left shoulder pain. *Defts' Ex.* 26 at p. 2. I noted an indentation of his clavicle on his left shoulder. *Id.* I could not tell if it was new or old. *Id.* I noted that the x-rays showed no fracture present. *Id.* He had full range of motion and good strength in his grip. *Id.*

I diagnosed acute tendinitis of the left shoulder. *Defts' Ex.* 26 at p. 2. Wolfe was given a Decadron injection and prescribed Prednisone and Ibuprofen. *Id.* I was suspicious his complaint far exceeded his problem. I was also suspicious this was an old injury.

On June 15th, Wolfe said he couldn't tolerate the Prednisone. *Defts' Ex.* 26 at p. 3. He said it made him feel funny so he had stopped it. *Id.* He said he was feeling better. *Id.* I concluded he should just finish off the Ibuprofen and no further treatment was needed. *Id.* Ibuprofen is a good anti-inflammatory and good for pain.

On June 30th, I saw Wolfe again complaining of pain in his left shoulder. *Defts' Ex.* 26 at p. 5. He had a full range of motion. *Id.* I noted the x-rays had been negative. *Id.* I noted he had a little indentation on his clavicle but it was nice and smooth. *Id.* I stated it was healed well and possibly an old injury. *Id.*

AO72A
(Rev. 8/82)

Wolfe told me it had happened during the riot at the jail. *Defts' Ex.* 26 at p. 5. He said he was handcuffed and jerked around. *Id.* I didn't believe this could have resulted in the injury. *Id.* I decided to recheck the actual x-ray report. *Id.* I probably didn't have the actual report just the nurse's verbal report. I noted Wolfe's complaints exceeded the physical findings, he had a negative attitude, and an argumentative attitude. *Id.*

I saw him again on July 8th. *Defts' Ex.* 26 at p. 6. Wolfe maintained he had an acute injury and was in pain. *Id.* I noted that with a certain position, Wolfe could show a deformity of his left clavicle. *Id.* However, the bone was very smooth and easy to touch and well healed. *Id.* It appeared to be an old injury that had occurred many months ago. *Id.*

I told Wolfe all three x-ray views were negative for fracture, dislocation, or any problem. *Defts' Ex.* 26 at p. 6. I told him I didn't believe he was telling the truth. *Id.* He asked for something for pain. *Id.* I didn't believe he was having pain but to appease him I gave him Ibuprofen for two days. *Id.* I had the impression he was seeking drugs or for some reason was trying to establish that the deformity was caused at the jail. *Id.*

The bump on his shoulder is the clavicle. It is either a healed injury or a congenital deformity. Just because he has a deformity doesn't mean he has pain.

In my opinion, the injury absolutely did not happen on June 2nd. This is based on my physical findings and the x-ray findings. I can't read x-rays better than a radiologist. I rely on the radiologist.

### June 2, 2004, Video-tape

The video-tape is taken from just outside the pod. It shows eleven inmates outside their cells in the common areas of E-pod.

-34-

On the bottom tier, there are six inmates outside their cells. One inmate is using a broom to push soapy water around the floor. There is an overturned waste basket laying on the pod floor. At least one cell door on the bottom tier is standing open. Several inmates are in jail uniforms, one or two inmates have no shirts on, a couple of inmates have towels or t-shirts over their heads or shoulders.

On the upper tier, there are five inmates outside their cells. Four are seated with their backs against the walls and/or cell doors. One inmate is initially seated on the stairs leading from the bottom tier to the upper tier and then goes the rest of the way up to the top tier.

Several remarks from unidentified jailers can be discerned. For instance, one jailer remarks that initially there were fourteen inmates outside their cells but that three had since gone into their cells. A remark is made that the broom could be used as a weapon. Additionally, it is remarked that the inmates could have soap wrapped up in the towels.

Occasionally, an inmate's comment can be made out. For instance, at one point an inmate approaches the glass separating the jailers from the pod and asks where the food is.

On the bottom tier a couple of the inmates appear to be praying. One inmate takes a few kicks, lasting at most a few seconds, in what could be described as marshal arts moves. The remainder of the time the inmates on the bottom tier are just generally moving about the pod.

When the pod door is opened, a flash bang grenade is thrown to the left side of the pod. The SERT and SWAT teams enter in two columns yelling, among other things: "Everyone get down." Some team members stay on the bottom tier while others immediately head up to the top tier.

-35-

On the bottom tier in the left hand corner of the pod an officer can be seen using a baton to subdue an inmate. Other officers can be seen using force to take inmates to the floor. The cell doors are opened. Within a minute or two of the pod being entered, one inmate is led out and other inmates can be seen laying on the floor handcuffed.

No other use of force is depicted on the video-tape. Wolfe does not appear on the video-tape.

## II. DISCUSSION

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States. "To establish a claim under 42 U.S.C. § 1983, [a plaintiff] must show [1] a deprivation [under color of law] of [2] a right, privilege, or immunity secured by the Constitution or the laws of the United States." *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir. 1999), *cert. denied*, 531 U.S. 819, 121 S. Ct. 60, 148 L. Ed. 2d 26 (2000).

As noted above, Wolfe has asserted three separate claims. First, he contends unidentified SWAT and/or SERT members and Captain Petray used excessive force against him during a riot on June 2, 2004. Second, he contends he was denied adequate medical care for injuries he sustained as a result of the use of force. Third, he contends his First Amendment free exercise of religion rights were violated when he was denied the right to have a prayer feather. We will address each claim in turn.

### *Use of Excessive Physical Force*

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of

-36-

force." *Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).

"[T]he constitutional standard applied may vary depending upon whether the victim is an arrestee, a pretrial detainee, or a convicted inmate of a penal institution." *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001).

In this case, Wolfe testified he was in the BCDC on pending criminal charges. Typically, "[p]re-trial detainees are those individuals who the government has probable cause to believe have committed crimes. *Gerstein v. Pugh*, 420 U.S. 103, 114, 95 S. Ct. 854, 863, 43 L. Ed. 2d 54 (1975). They are confined pending trial, either because there is cause to believe that they are dangerous or because they cannot afford to make bail." *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989).

> In *Johnson-El v. Schoemehl,* the Eighth Circuit court noted that:
>
> [u]nlike convicted prisoners, the state has no right to punish [pretrial detainees]. *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 1871-72, 60 L. Ed. 2d 447 (1979). Their confinement conditions are analyzed under the due process clause of the Fifth and Fourteenth Amendments rather than the Eighth Amendment's "cruel and unusual punishment" standard which is used for convicted prisoners. *Id*. The injuries detainees suffer must be necessarily incident to administrative interests in safety, security and efficiency. As a pretrial detainee, Freeman's excessive-force claim is properly analyzed under the due process clause of the Fourteenth Amendment. *See Graham v. Conner*, 490 U.S. 386, 395 & n. 10 (1989) (due process clause protects pretrial detainee from force amounting to punishment).

*Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989).

In general, the courts analyze excessive force claims of pretrial detainees in the same way as those of arrestees. *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001)("The evaluation of excessive-force claims brought by pre-trial detainees, although grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective

reasonableness standard.").  The use of force must be necessary to some legitimate institutional

interest such as safety, security, or efficiency, and the force used must not be in excess of that

reasonably believed necessary to achieve those goals.  *Schoemehl*, 878 F.2d at 1048.  The

relevant inquiry being whether the officials behaved in a reasonable way in light of the facts and

circumstances confronting them.  *See e.g., Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996).

In this case, there is a dispute as to whether any force was used against Wolfe other than

that used to simply handcuff him.  Wolfe maintains that while he was laying on the floor of his

cell on his stomach with his hands cuffed behind his back that two or three unidentified SWAT

or SERT members entered his cell and hit and/or kicked him a total of fifteen times in the ribs

and legs.  After Clifford stated no one in a red and white uniform was involved, the beating

ceased and the team members left.  A short while later, Wolfe maintains Petray came into the cell

and kicked him in the head twice.  Wolfe's testimony regarding the force used by the team

members is borne out in part by the testimony of  Ian Bruce who indicated he could see officers'

feet moving toward Wolfe and his body jerking.

We find Wolfe's testimony not credible.  First, although Wolfe submitted numerous

grievances and requests for medical treatment while incarcerated at the BCDC, not a single one

mentioned an alleged use of excessive physical force by SWAT or SERT members or Petray on

June 2, 2004.  *See Defts' Ex.* 12 (6/3/04-shoulder hurts); *Defts' Ex.* 14 (6/6/04–shoulder hurts);

*Defts' Ex.* 15 (6/17/04-shoulder hurts); *Defts' Ex.* 16 (6/23/04–shoulder hurt again when

handcuffed me in cell D-130); *Defts' Ex.* 17 (6/20/04-need copy of medical report–steroids they

gave me are causing my head and spine to hurt); *Defts' Ex.* 18 (6/24/04-shoulder hurts want

second opinion); *Defts' Ex.* 19 (6/25/04-cumulative impact of conditions–among other things

-38-

being denied medical attention); *Defts' Ex.* 20 (6/28/04–shoulder hurts); *Defts' Ex.* 21 (6/29/04-not getting medical back and need them for legal reasons); *Defts' Ex.* 22 (6/30/04-denied medical attention); *Defts' Ex.* 23 (6/30/04-want name of radiologist); *Defts' Ex.* 24 (7/6/04-hurt shoulder). *See also Plff's Ex.* 1 (6/17/04–prayer feather); *Plff's Ex.* 2 (6/10/04-prayer feather); *Plff's Ex.* 4 at p. 5 (6/14/04-need to see doctor regarding medication received on June 9th).

Second, Wolfe testified the hits and kicks inflicted by both the teams members and Petray were extremely forceful and hard. In fact, Wolfe stated his pain was so severe that he would rate it at a ten on a scale of one to ten with ten being the most severe pain. Despite this, Wolfe suffered no visible injuries and no injuries that needed treatment other than the injury to his shoulder. No evidence suggests the shoulder injury resulted from the use of force by the team members or Petray.

Although Wolfe does mention bruises and general soreness, he made no mention of these injuries in any of his numerous medical requests. Additionally, no mention appears in any of the medical records regarding any such injuries or soreness. Instead, the only injury he discussed with Nurse McDonald and Dr. Mullins was the alleged injury to his left shoulder.

Third, with respect to the injury to his shoulder, Wolfe testified that although he couldn't say for sure, he believed he sustained this injury when Rahn and Donahoe lifted him off the floor while he was handcuffed. William Bennett who testified he suffered a nearly identical injury also testified his injury occurred when he was lifted off the floor. Thus, the injury is not attributable to the actions of the SWAT or SERT members or Petray. We find Wolfe has failed to establish that excessive force was used against him.

### Denial of Medical Care

As noted above, Wolfe was a pretrial detainee during his incarceration at the BCDC. Thus, his claims are more properly analyzed under the due process clause of the Fourteenth Amendment than the Eighth Amendment. *Hartsfield v. Colburn*, 371 F.3d 454, 456-457 (8th Cir. 2004). "The standard to be applied in assessing a pretrial detainee's claim of due process violations . . . is not entirely clear." *Spencer v. Knapheide Truck Equipment Co.*, 183 F.3d 902, 906 (8th Cir. 1999)(citation omitted). Nevertheless, "[t]he Supreme Court has held that pretrial detainees are entitled under the Fourteenth Amendment to 'at least as great' protection as that afforded convicted prisoners under the Eighth Amendment." *Id.* (*quoting City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S. Ct. 2979, 77 L. Ed. 2d 605 (1983).

In the absence of a clearly binding standard, the Eighth Circuit in analyzing inadequate medical care claims brought by pretrial detainees has applied the Eighth Amendment's deliberate indifference standard. *See e.g., Hartsfield*, 371 F.3d at 456-457; *Spencer,* 183 F.3d at 905-06; *Hall v. Dalton*, 34 F.3d 648, 650 (8th Cir. 1994)(analyzing a pretrial detainee's claim of inadequate medical care under the deliberate indifference standard). "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*,

-40-

132 F.3d 1234, 1239 (8th Cir.1997)).   Additionally, "'[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Jolly*, 205 F.3d at 1096 (*quoting Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)).

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992).  "A medical need is serious if it is obvious to the layperson or supported by medical evidence." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam) (internal quotation and citation omitted).

"[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996).  In *Dulany v. Carnahan*, 132 F.3d 1234 (8th Cir. 1997), the Eighth Circuit said:

> As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment. Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976).  Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation. *Id.* at 106, 97 S. Ct. at 292.

*Dulany*, 132 F.3d at 1239.  *See also Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2001).

AO72A
(Rev. 8/82)

Here, the undisputed evidence establishes that Wolfe was sent to the hospital for x-rays within a short time of his shoulder being injured. The x-rays showed no fracture, dislocation, or other acute injury to his shoulder. Wolfe was treated by both Nurse McDonald and Dr. Mullins over the next several weeks as Wolfe continued to complain of shoulder pain.

Dr. Mullins in addition to Ibuprofen provided a Decadron injection and a prescription for Prednisone. Wolfe elected to discontinue the Prednisone because he felt he had an adverse reaction to the drug. Wolfe merely disagrees with the treatment decisions made by Nurse McDonald and Dr. Mullins. This does not state an actionable claim. *Smith v. Marcantonio*, 910 F.2d 500, 502 (8th Cir. 1990)(mere disagreement with course of treatment does not state constitutional claim for deliberate indifference).

Furthermore, to the extent Wolfe believes Dr. Mullins was simply wrong in concluding the shoulder injury was old and did not occur on June 2nd this also fails to state a claim. *Estelle*, 429 U.S. at 106 ("Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); *Jones v. Norris*, 310 F.3d 610, 612 (8th Cir. 2002)("Neither differences of opinion nor medical malpractice state an actionable Constitutional violation."). All decisions regarding his medical care were made by Nurse McDonald and/or Dr. Mullins. They were under no obligation to implement any treatment requested by Wolfe. *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). No evidence was introduced suggesting the orders of jail medical staff were not carried out. We find Wolfe has failed to establish that Dr. Mullins or Nurse McDonald exhibited deliberate indifference to his serious medical needs.

-42-

*Free Exercise of Religion*

Wolfe appears to assert both a First Amendment free exercise of religion claim and a statutory free exercise claim. We address first his First Amendment free exercise claim.

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987). "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S. Ct. 2400, 96 L. Ed. 2d 282 (1987). *See also Cruz v. Beto*, 405 U.S. 319, 92 S. Ct. 1079, 31 L. Ed. 2d 263 (1972).

This right, however, is not without limitation. The Supreme Court has recognized that "incarceration brings about the necessary withdrawal or limitation of many privileges and rights." *O'Lone*, 482 U.S. at 348. "The free exercise right is limited insofar as a prisoner's adherence to religious practices may be regulated by prison authorities, so long as such regulations are' reasonably related to legitimate penological interests.'" *Murphy v. Carroll*, 202 F. Supp. 2d 421, 424 (D. Md. 2002)*(quoting Turner*, 482 U.S. at 89; *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348-349, 107 S. Ct. 2400, 96 L. Ed. 2d 282 (1987); *Cruz*, 405 U.S. at 322). *See also Thomas v. Gunter*, 32 F.3d 1258, 1259-60 (8th Cir. 1994).

In analyzing a First Amendment free exercise claim, the court first addresses the "threshold issue of whether the challenged governmental action 'infringes upon a sincerely held religious belief,' and then app[ies] the *Turner* factors to determine if the regulation restricting the religious practice is 'reasonably related to legitimate penological objectives.'" *Murphy v.*

-43-

*Missouri Department of Corrections*, 372 F.3d 979, 983 (8th Cir. 2004), *cert. denied*, ___ U.S. ___, 125 S. Ct. 501, 160 L. Ed. 2d 378 (2004).  "Prison regulations that infringe on the constitutional rights of prisoners are judged by their reasonableness.  Prison officials are not required to choose the least restrictive means possible in furthering administrative interests." *Salaam v. Lockhart*, 905 F.2d 1168, 1171 (8th Cir. 1990).

"Whether or not [the use of a prayer feather] is a sincerely held religious belief is a factual determination." *Murphy*, 372 F.3d at 983.  We believe Wolfe's use of prayer feathers is a sincerely held religious belief.  We credit his testimony that as a Native American he believes the use of such feathers is necessary when communicating with the Great Spirit.

We also note that the role of various types of feathers in the religious activities of Native Americans is without question significant.  *See e.g.,* Amie Jamieson, *Will Bald Eagles Remain Compelling Enough to Validate the Bald and Golden Eagle Protection Act after ESA Delisting?*, 34 Envtl. L. 929, 935 (Summer 2004)("The importance of eagle feathers in some Native American religions can be compared to the importance of the Bible in Christianity.  The feathers, symbols of courage and respect, are used in significant events such as healing ceremonies, burials, ceremonial dances, and prayers.")(footnotes omitted); Brett Anderson, *Recognizing Substance:  Adoptees and Affiliates of Native American Tribes Claiming Free Exercise Rights*, 7 Wash. & Lee Race & Ethnic Anc. L. J. 61, 70 (Spring 2001)("Eagles are revered by Native Americans as a most sacred animal.  Many Native Americans believe eagles serve as messengers delivering the prayers of Native Americans to the Great Spirit.  In other words, the feathers enable Native Americans to communicate with the Great Spirit.  Because they are a medium for

-44-

religious dialogue, the feathers are of the upmost importance to the religious practices of Native Americans.")(footnotes omitted). *See also United States v. Hardman*, 297 F.3d 1116, 1126-1127 & n. 17 (10th Cir. 2002)(The "eagle feather is sacred in many Native American religions." However, the court recognized that not all Native Americans believe the eagle feather is sacred. It noted the turkey feather is sacred to the Pueblo and water birds to some of the Oklahoma tribes etc.); *Farrow v. Stanley*, Civ. 02-567, 2004 WL 224602 (Feb. 5, 2004)("Shaulis testified that . . . feathers are integral to Native American religion" and "[f]eathers are used in prayer."). Additionally, both the Migratory Bird Treaty Act (MBTA), 16 U.S.C. § 703, and the Bald and Golden Eagle Protection Act (BGEPA), 16 U.S.C. §§ 668-668d, allow Indians to obtain permits to possess feathers for Indian religious uses.

There can be no doubt the decision made by Captain Petray and Sheriff Ferguson to prohibit the possession of prayer feathers infringed upon Wolfe's belief. We therefore turn to consideration of the four factors set forth by the Supreme Court in *Turner v. Safely*, 482 U.S. 78, 89-90, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987). In *Turner* the Court set forth a reasonableness test consisting of four factors used to balance an inmate's free exercise right and the prison's legitimate correctional goals and security concerns.

Specifically, the court considers: (1) whether there exists a rational connection between the prison policy or regulation and a legitimate governmental interest advanced as its justification; (2) whether there are alternative means of exercising the right notwithstanding the policy or regulation; (3) what effect accommodating the exercise of the right would have on guards, other prisoners, and prison resources generally; and (4) whether there are ready, easy-to-

-45-

implement alternatives that would accommodate the prisoner's rights. *Turner*, 482 U.S. at 89-91.

In this case, it is an administrative decision and not a regulation of the BCDC that is at issue. While detention facilities are not required to make available religious materials for every faith, *cf. Allah v. Al-Hafeez*, 208 F. Supp. 2d 520, 530 (E.D. Pa. 2002)("The State does not have an affirmative duty to provide every prisoner with the clergy person or the service of his or her choice."), here an affirmative decision was made to ban Wolfe from having prayer feathers. Thus, Wolfe was precluded from obtaining these feathers on his own or having them donated to the facility for his use and the use of other Native Americans. Without his prayer feather, Wolfe believed he could not communicate with the Great Spirit.

Defendants advanced three reasons to support their total ban on the use of prayer feathers. Their primary reason was security. They believed a prayer feather could be used as a weapon. For example, they indicated the quill might be used to injure or harm a person particularly in a vulnerable area such as an eye. Second, they believed allowing Wolfe to have a personal item in his cell might cause discontent among other inmates. Third, the sheriff opined that a feather might be used for sexual gratification.

Feathers had never been allowed into the facility. Thus, defendants could not advance for the court's consideration a single instance in which they had experienced a problem with a feather or had been unable to control or limit the use of feathers to the meaningful practice of religion by American Indians.

While we believe defendants clearly have very legitimate concerns regarding the safety and security of inmates and personnel as well as needing to have the ability to control contraband, minimize conflicts between inmates, promote cleanliness, and eliminate fire hazards, we believe defendants' response in this case was exaggerated. Inmates are allowed to possess and keep in their cells pencils, toothbrushes, and other items that can potentially serve as weapons, some perhaps more effective weapons, than a feather. In this case, defendants response to Wolfe's inquiry was to completely ban prayer feathers.

No effort was made to examine alternatives to the complete ban. No consideration was given to providing Wolfe with controlled access to a prayer feather. In Wolfe's case, he was on lock-down. According to the testimony, this meant he was locked in his cell twenty-three hours a day. He was housed by himself. He could have been allowed access to a prayer feather for a limited period each day and be required to turn the feather back into jailers prior to being allowed his one hour out of the cell per day. In other words, access to the prayer feather could have been regulated or controlled to alleviate safety and security concerns. We find defendants' concerns were exaggerated and their decision precluded Wolfe from having a reasonable opportunity to practice his religion. We conclude both the first and second *Turner* factors weigh in favor of Wolfe.

The third factor requires the court to consider the impact accommodation of the asserted constitutional right will have on guards, other inmates, and the allocation of resources generally. We believe the impact would be small. Wolfe testified a family member could bring a prayer

-47-

feather to the facility for him.  Wolfe made no request that defendants purchase a feather or multiple feathers for him.

Allowing Wolfe to either keep a feather in his cell or have controlled access would have very little impact on the guards at the facility or on the other inmates.  Wolfe was on lock-down twenty-three hours per day.  He had no interaction with other inmates and only interacted on a limited basis with the guards.  As the feather was a religious item, similar to a Bible, the court doubts it would have caused discontent among inmates.  It would require little additionally supervision or interaction with the guards for Wolfe to be provided access to a prayer feather. The third *Turner* factor weighs in favor of Wolfe.

The fourth *Turner* factor requires us to consider whether there are ready, easy-to-implement alternatives that would accommodate the prisoner's rights.  As noted above, defendants could easily have accommodated Wolfe's rights by allowing him controlled access to a prayer feather.  We therefore conclude the fourth *Turner* factor weighs in favor of Wolfe.

Considering the totality of the evidence in view of the four *Turner* factors, we conclude Wolfe has proved that defendants' action in denying his request for a prayer feather was not reasonably related to valid penological interests.  Wolfe has established that the defendants' actions violated the Free Exercise Clause of the First Amendment of the United States Constitution.

With respect to his statutory claim, Wolfe contends the defendants violated the American Indian Religious Freedom Act, 42 U.S.C. § 1996.  This Act provides as follows:

> On and after August 11, 1978 it shall be the policy of the United States to protect and preserve for American Indians their inherent rights of freedom to believe,

-48-

express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom of worship through ceremonials and traditional rites.

42 U.S.C. § 1996. This Act "requires federal agencies to consider, but not necessarily to defer to, Indian religious values; it does not prohibit agencies from adopting all land uses that conflict with traditional Indian religious beliefs or practices." *Wilson v. Block*, 708 F.2d 735, 746 (D.C. Cir. 1983). The Act does not "create a cause of action or any judicially enforceable individuals rights." *Lyng v. Northwest Indian Cemetery Protective Ass'n.*, 485 U.S. 439, 455, 108 S. Ct. 1319, 99 L. Ed. 2d 534 (1988).

However, the Religious Land Use and Institutionalized Persons Act (RLUIPA) prohibits governmental imposition of a "substantial burden on the religious exercise" of an inmate "even if the burden results from a rule of general applicability," unless the defendants can show that the burden (1) is in furtherance of a compelling governmental interest and (2) is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. § 2000cc-1(a)(1)-(2).[2] The term "religious exercise" is defined to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).

The Supreme Court has upheld RLUIPA against a challenge under the Establishment Clause. *Cutter v. Wilkinson*, ___ U.S. ___, 125 S. Ct. 2113, 161 L. Ed. 2d 1020 (2005).[3] In

---

RLUIPA, Section 3 which is at issue here, applies when the substantial burden is imposed in a program or activity that receives Federal financial assistance. Defendants have made no argument that the BCDC does not receive federal financial assistance. 42 U.S.C. § 2000cc-1(b)(1)-(2).

The decision in *Cutter* was issued on May 31, 2005. However, the effective date of the RLUIPA was September 22, 2000. *See also Murphy v. Missouri Department of Corrections*, 372 F.3d 979 (8th Cir. 2004)(applying RLUIPA), *cert. denied,* ___ U.S. ___, 125 S. Ct. 501, 160 L. Ed. 2d 378 (2004).

AO72A
(Rev. 8/82)

doing so, it noted that RLUIPA "is the latest of long-running congressional efforts to accord religious exercise heightened protection from government-imposed burdens, consistent with this Court's precedents." *Id.*, 125 S. Ct. at 2117-2118. It found "RLUIPA's institutionalized-persons provision compatible with the Establishment Clause because it alleviates exceptional government-created burdens on private religious exercise." *Id.,* 125 S. Ct. at 2121. The Court states that "RLUIPA thus protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Id.*, 125 S. Ct. at 2122. Properly applied "courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries, and they must be satisfied that the Act's prescriptions are and will be administered neutrally among different faiths." *Id.* (citations omitted).

In footnote five of the opinion, the Court noted that the hearings held before Congress when the RLUIPA was being enacted revealed "that prisoners' religious possessions, such as the Bible, the Koran, the Talmud or items needed by Native Americans, . . . were frequently treated with contempt and were confiscated, damaged or discarded by prison officials." *Id.*, 125 S. Ct. at 2118 n. 5 (internal quotation marks omitted). The Court recognized that security is a compelling state interest and that deference is due to institutional officials' expertise in this area. *Id.*, 125 S. Ct. at 2123 & n. 13.

To prevail on this claim, Wolfe must establish that defendants' ban on prayer feathers imposed a substantial burden on his religious exercise. To be considered a substantial burden, the Eighth Circuit has said "the governmental action must 'significantly inhibit or constrain conduct or expression that manifests some central tenet of a [person's] individual [religious]

-50-

beliefs; must meaningfully curtail a [person's] ability to express adherence to his or her faith; or must deny a [person] reasonable opportunities to engage in those activities that are fundamental to a [person's] religion.'" *Murphy v. Missouri Department of Corrections*, 372 F.3d 979, 988 (8th Cir. 2004)(*citing Weir v. Nix*, 114 F.3d 817, 820 (8th Cir. 1997)(case decided under RFRA–internal quotation marks and citations omitted)).

This Act encompasses a higher standard of review than that which applies to constitutional free exercise claims. *Murphy*, 372 F.3d at 986. The government must "meet a higher burden than the rational relation test applicable in constitutional claim cases." *Id.* at 987. This they cannot do.

As noted above, Wolfe has established that his religious practice was substantially burdened by the decision of Captain Petray and Sheriff Ferguson to prohibit his possession of a prayer feather. Defendants can prevail only if they establish that their choice to totally ban Wolfe's prayer feathers was the least restrictive means to further a compelling interest. For the reasons discussed above, we conclude defendants cannot satisfy the "heavier burden imposed upon them under the RLUIPA." *Murphy*, 372 F.3d at 988.

Having concluded Wolfe has met his burden of proof on both his First Amendment Free Exercise Claim and his claim under RLUIPA, the question becomes what damages he is entitled to recover. Both causes of action are, of course, based on the same action taken by the defendants and resulted in the same injury to Wolfe.

Injunctive relief is not appropriate as Wolfe is no longer confined to the BCDC. *Smith v. Hundley*, 190 F.3d 852, 855 (8th Cir. 1999)(inmate's claim for injunctive relief mooted when he was transferred to another facility). Wolfe has made no argument that he remains under the

-51-

control of the defendants. *See Randolph v. Rodgers*, 170 F.3d 850, 856-57 (8th Cir.

1999)(inmate suing Missouri Department of Corrections (MDOC) and various MDOC officials

entitled to injunction against MDOC despite his transfer to new MDOC facility during course

of lawsuit; he remained under the control of MDOC, which controlled both facilities).

Compensatory damages under § 1983 are governed by general tort-law compensation

theory. *See Carey v. Piphus*, 435 U.S. 247, 255, 98 S. Ct. 1042, 55 L. Ed. 2d 252 (1978). In

*Carey*, the Supreme Court noted that damages are available under § 1983 for actions "found .

. . to have been violative of . . . constitutional rights and to have caused compensable injury."

*Id.* (internal quotation marks and citations omitted). The law generally provides that damages

may be awarded for injuries such as mental anguish and suffering, personal humiliation, and

monetary losses. *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 307, 106 S. Ct.

2537, 91 L. Ed. 2d 249 (1986)(citations omitted). However, damages may not be awarded for

the abstract or subjective value of the constitutional right at issue. *See Stachura*, 477 U.S. at

308; *Carey*, 435 U.S. at 248.

The generally applicable rules have been altered when it comes to civil rights actions

brought by prisoners. Codified as 42 U.S.C. § 1997e(e), section 803(d) of the Prison Litigation

Reform Act of 1996 (PLRA) provides as follows: "No Federal civil action may be brought by

a prisoner confined in jail, prison, or other correctional facility, for mental or emotional injury

suffered while in custody without a prior showing of physical injury."

In *Royal v. Kautzky*, 375 F.3d 720, 723 (8th Cir. 2004), *cert. denied*, ___ U.S. ___, 125

S. Ct. 2528, 161 L. Ed. 2d 1111 (2005), a case in which plaintiff argued he had been retaliated

against for filing complaints and grievances, the Court of Appeals for the Eighth Circuit ruled

AO72A
(Rev. 8/82)

that the physical injury requirement of the PLRA "limit[ed] recovery for mental or emotional injury in all federal actions brought by prisoners." The court also noted that Royal could not recover some indescribable and indefinite damage allegedly arising from a violation of his constitutional rights. *Id.* at 724. Section 1997e(e), however, did not bar the recovery of other types of relief such as nominal damages, punitive damages, and injunctive and declaratory relief. *Id.* Section 1997e(e) bars Wolfe from recovering compensatory damages for the mental and emotional injuries he suffered.

Similarly, while the RLUIPA allows for the recovery of "appropriate relief," 42 U.S.C. § 2000cc-2(a), it has not been held that general compensatory damages are available under the statute. *Guru Nanak Sikh Society of Yuba city v. County of Sutter*, 326 F. Supp. 2d 1140, 1161 (E.D. Cal. 2003). Furthermore, as discussed above, we believe § 1997e(e) would bar the recovery of compensatory damages by Wolfe.

We believe, however, that an award of nominal damages is appropriate. *Elrod v. Burns*, 427 U.S. 347, 373-74, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976)("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Risdal v. Halford*, 209 f.3d 1071, 1073 (8th Cir. 2000)(holding court must award nominal damages in the amount of $1.00 for First Amendment violations); *Guru Nanak Sikh Society of Yuba City v. County of Sutter*, 326 F. Supp. 2d 1140, 1162 (E.D. Cal. 2003)(nominal damage award appropriate under RLUIPA). Accordingly, we will recommend that Wolfe be awarded nominal damages in the amount of $1.

We turn to the question of whether an award of punitive damages is appropriate in this case. Punitive damages may be awarded at the discretion of the fact finder once sufficiently

-53-

serious misconduct by the one or more of the defendants is shown to exist. *Smith v. Wade*, 461 U.S. 30, 52, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983). The purpose of punitive damages is to punish the defendants and/or deter similar conduct in the future. *See Pacific Mutual Life Ins. Co. v. Haslip*, 499 U.S. 1, 19-20, 111 S. Ct. 1032, 1044, 113 L. Ed. 2d 1 (1991). In § 1983 cases it has been said that punitive damages are appropriate "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Walters v. Grossheim*, 990 F.2d 381, 385 (8th Cir. 1993)(internal quotation marks and citation omitted).

Having given careful consideration to testimony elicited at the evidentiary hearing, we conclude Wolfe is not entitled to an award of punitive damages under either § 1983 or RLUIPA. Although we concluded the decision to deny Wolfe a prayer feather violated his free exercise rights, we do not believe the evidence elicited shows the conduct was motivated by evil motive or intent or involved reckless or callous indifference to Wolfe's federally protected rights.

### III. CONCLUSION

I therefore recommend that judgment be entered in plaintiff's favor against Captain Petray and Sheriff Ferguson on his claims that they violated the Free Exercise Clause of the First Amendment of the United States Constitution and the Religious Land Use and Institutionalized Persons Act (RLUIPA) when they denied him a prayer feather. I recommend that plaintiff be awarded nominal damages in the amount of $1 on these claims. Further, I recommend that judgment be entered in defendants' favor on plaintiff's excessive force claim and his claim that he was denied adequate medical care.

-54-

The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.

DATED this 8th day of September 2005.


/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)